## In re DOZIER WHOLESALE GROCERY CO.

### (District Court, S. D. Alabama, N. D. March 25, 1916.)

### No. 1688.

BANKRUPTCY ⟲381—COMPOSITION—OBJECTIONS TO CONFIRMATION.

Evidence considered, and held not to sustain objections to the confirmation of a composition offered by a bankrupt on statutory grounds, and to show that the composition would yield a larger dividend to general creditors than could probably be realized from the administration of the estate, and was for their best interest.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 591; Dec. Dig. ⟲381.]

In Bankruptcy. In the matter of the Dozier Wholesale Grocery Company, bankrupt. On report of W. K. Campbell, referee and special master, on objections to confirmation of composition. Objections overruled, and composition confirmed.

The following is the report of W. K. Campbell, Special Master:

The evidence offered by objecting creditors assumed a very wide range, and obviously much of it is immaterial to any of the issues tendered by the specifications. Counsel for objecting creditors filed a brief from which it appears that the propositions relied upon by them may be briefly summarized as follows: (1) That the letter of Mr. E. Lamar and that of Mr. A. W. Stewart, the bankrupt's attorney, "were calculated to mislead the creditors" as to the financial status of the bankrupt. (2) That the claim of C. H. Dozier, Sr., president of bankrupt, should not have been allowed. (3) That the true condition of bankrupt's financial condition was concealed. (4) That the subscription of C. H. Dozier for $12,000 of stock on or about January 14, 1914, has not been paid at all, or has not been fully paid. (5) That the real value of the warehouse, belonging to bankrupt's estate, was concealed from the creditors. (6) That large sums of money were paid out by bankrupt to some of its creditors for debts due them within four months preceding bankruptcy, thereby constituting preferences which are recoverable by bankrupt estate. As these are the only propositions pointed out by objecting creditors in brief, upon which they rely to sustain their specifications of objection, the summary of the evidence will be limited to that having some probative relations to said propositions.

The first and third propositions appear to be based on the letters of Lamar and Stewart to the creditors. Both of these appear to be printed in typewriter type, that of Mr. Lamar being dated January "41," 1916 (evidently intended for 14). Briefly summarizing its contents, it is to the following effect: That some days ago the Selma creditors of bankrupt had a conference, and with such facts as were before them, it appeared that bankrupt's president and its principal business factor had become incapacitated by disease from giving any attention to the business; that he had been in confinement in a hospital for three months; that the business was in the hands of his young son, of but little experience; that it was obvious that it was to the interest of all creditors to place the concern in bankruptcy; that Reese & Reese, attorneys at Selma, Alabama, had been authorized and employed to file a petition in involuntary bankruptcy for the benefit of all the creditors; that an adjudication had been obtained; that Mr. Blalock of Selma had been appointed receiver, and was in charge of the effects, having an inventory made; that according to the judgment of said (petitioning) creditors "it would seem that the best interests of the creditors would be protected by being consolidated or centralized in the hands of one firm of attorneys, those already employed by said creditors" (the names of the petitioning creditors are here stated); that the writer is a member of the firm of L. & E. Lamar, who in-

⟲For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

forms the creditors of the foregoing facts and invites their co-operation. Suggestion is made that, "if you desire to co-operate with us in handling this estate, * * * you can sign up and mail your claim to them (Reese & Reese) if you so determine it to be to your best interest to co-operate with us; otherwise, of course, you can handle your claim in any way you think best. In either event, we will be glad to keep you informed as to progress." The testimony shows that this letter was mailed to some of the creditors, but fails to show how many. The manuscript from which this letter was printed was delivered to printer by Mr. Reese.

The letter of Mr. Stewart is dated January 27, 1916. The pertinent parts are: That the failure of bankrupt is largely due to ill health of C. H. Dozier for last two years, during which time he has mostly been confined in hospitals, including the State Insane Hospital; that "the assets of the company, as shown by the inventory of the receiver, are as follows: [Here follows the inventory value and the appraised value of the assets as shown by said receiver's inventory, and the figures correspond in each particular with the respective figures in inventory filed in my office.]" It further states that the writer has arranged to provide money to make a 25 per cent. composition, and concludes as follows: "I have arranged to provide money to carry out this offer, which I think is to the interest of the creditors. Without in any way attempting to influence your action, I have for your convenience attached hereto a perforated slip, with the suggestion that, if you deem it to your interest, you sign and send to your attorney, or Hon. Wm. King Campbell, referee, Selma, Ala., prior to first meeting of creditors. If a sufficient number indicate acceptance the money will be immediately paid into court on the day of said meeting and promptly paid to the creditors, or you can mail to me direct your acceptance."

The evidence shows that Mr. Stewart sent or brought the original from which said letter was printed to Mr. Reese at Selma, and asked him as a "courtesy" to deliver it to the printer. After it was printed, Mr. Stewart mailed it out from Marion to the creditors, and mailed some of them to Reese & Reese, who represented a majority of the creditors who had filed their claims, who mailed them to some of the creditors whom they represented. writing a letter therewith as follows: "We inclose herewith a circular letter from Mr. A. W. Stewart, of Marion, Ala., bankrupt's attorney, which we have compared with the official inventory and schedules on file in the referee's office, and find the figures taken therefrom correct. We hardly think at this season and under the prevailing depressed conditions that the assets will sell for more than $5,000. Book accounts remaining unpaid at this season in this section are generally of little value; when sold in block rarely bring more than 10 per cent. In order to pay the expense, fees, and costs of bankruptcy, and the claims entitled to payment in full, and leave sufficient amount for a dividend of 25 per cent., it would be necessary for the trustee to realize about $8,500 from the sale of the assets. This we think very improbable, if not impossible. Kindly instruct your wishes in the matter." At the time of mailing the letters by Stewart, he had Mr. Reese to file one of the letters in my office.

As it seems a contention of objecting creditors that the warehouse is the basis of the alleged concealment of the value of the assets, a summary of the evidence relating thereto is substantially as follows:

Said warehouse is a brick structure with a cement floor. It is located on the right of way or lands of the Southern Railway Company, under a license from said railway. The written contract evidencing said license is in evidence. In said contract the bankrupt is styled the "licensee." It provides a payment of $57 per annum to the railway company, and contains among others, the following provisions:

"(3) That this license is a personal privilege to the licensee hereunder, and is not transferable or assignable, and any attempt to transfer or assign same shall operate as a forfeiture of this license.

"(4) That the licensee will post, and at all times thereafter and during the life of this agreement maintain, in a conspicuous place upon said warehouse, a notice reading as follows: 'No goods, wares, merchandise, or other prop-

erty, except that of Dozier Wholesale Grocery Company, shall be stored or placed in this warehouse, without the consent, in writing, of Southern Railway Company.' "

"(6) That it [licensee] will indemnify and save harmless the railway company against any and all loss of or damage to the property of the railway company, and against all claims, demands, suits, judgments, or sums of money accruing to licensee or to any other party, against the railway company, for loss or injury, caused by fire or otherwise, however resulting, either to person or estate, and arising by reason of or in connection with the occupation and use by licensee of said premises of the railway company, and the presence of the warehouse of the licensee thereupon."

"(8) That in the event that the licensee shall be in default for 30 days in the payment of any rental payment, payable to the railway company hereunder, then forthwith upon such default or violation, and at all events upon 30 days' notice in writing so to do, served upon it by the company, the licensee will remove said warehouse from the premises of the railway company, and vacate said premises, and restore the same to their condition existing prior to the occupation and use thereof by the licensee and the erection of said warehouse thereupon, or in default thereof the railway company may itself re-enter upon said premises, remove said warehouse, and restore the said condition of said premises, but at the expense of the licensee. And it is understood and agreed that the right of the railway company to revoke this license and require the licensee to remove said warehouse and vacate said premises by notice, as aforesaid, shall always obtain, notwithstanding payment of rental in advance and full compliance by the licensee with all of its covenants in this agreement contained."

On the schedule as filed by bankrupt at the end of Schedule B, appears the following note: "Note. In addition to the above property, bankrupt erected a warehouse on the property of the Southern Railroad, and under his [its] contract, it has the right to remove the material therein. It is impossible to estimate its value."

It appears from the evidence that the cost of construction of this warehouse was $3,220, of which the labor constituted about $1,024; that the flooring is of concrete, and constitutes about one-third of the total cost of the building; that the walls are of brick, cemented with a mortar of cement, lime, and sand, which makes a harder substance than the brick. Stewart also testified (same page) that the wooden structure on the lot would not be worth $50 if torn down and used. J. C. Foster, the attorney for objecting creditors, testified that the value of the brick warehouse in his opinion was $2,000; that of the wooden building being $500. This witness stated that he had only lived in Marion since the middle of last April; that he had never been in the real estate business, nor bought or sold real estate there. This witness also swore that the property referred to in the petition as being worth $3,000 was this warehouse; witness being asked in reference to said warehouse the following question: "Q. You swear in here [in specification] that the warehouse is worth at least $3,000? A. I swore that was my belief. Q. You don't know what it is worth? A. No, sir; I was swearing to what I believed it was worth."

Mr. T. D. Kemp, of Marion, testified that he was a civil engineer and architect; had had much experience in construction work of various kinds; that he was familiar with the plans and specifications of said warehouse; that the mortar therein, from its degree of hardness, contained a large percentage of cement; that in tearing down a building containing such cement the salvage would be less than in case of ordinary mortar; that the flooring was of concrete, and constituted from one-fourth to one-third of entire cost of building; that in removing the building he would not consider it of any value; that "it would only be fit for rubbish, for filling holes"; that it would have no market value; that the wooden building was built of "merchantable rough stuff, what we call log run lumber"; that the material salved from taking down the buildings, under the terms of the contract, would hardly be sufficient to put the ground in its original condition.

J. A. Wood, a witness for objectors, was asked: "Can you say that you

know the market value of that property, the warehouse of the Dozier Wholesale Grocery Company?" to which he answered, "I couldn't say that I do, but I could give an idea of what I think the value is." Subsequently, in answer to question as to market value of said warehouse, he said: "I would say $2,000," and as to the wooden structure said, "$500, I would say." This witness was asked as to the value of the material in said building if torn down, but objection to said question was sustained on the ground that witness was not shown to know the market value thereof. His answer, however, was taken down—respectively, $400 for brick building and $100 for wood building. He further testified that he did not know what would be the cost of tearing down the brick building, and that he thought it would cost $25 to tear down the wood building; that with a higher per cent. of cement in mortar there is a greater loss in brick in tearing down; that he never examined the mortar in said building.

F. V. Woodfin, on behalf of objectors, testified that prior to the building of the brick warehouse he had a license from the railway company for the ground now occupied by said building— that is, the brick warehouse; that said wooden structure was then on said ground; that the railroad was willing for him to continue said occupation under said license; that the Dozier Wholesale Grocery Company wanted said place, and paid witness $900 for his privileges, including the buildings on said ground; that after said transaction said wooden building was moved off the space on which brick building stands.

W. C. Dozier, for bankrupt, testified that the bankrupt had tried to sell the wooden building to Mr. Ed. Curb, and asked him to make a bid for it; that he offered nothing for it, but was willing to move it off for the salvage. Witness further testified that when the brick building was erected the contractor was required to tear down said wood building or move it, and he moved it, instead of tearing it down; that it was cheaper for said contractor to move said building than to tear it down; that at time of said transaction with Woodfin he had a line of business which bankrupt desired to handle, and it desired to get him out of business, said line being brick, lime, and cement.

There is no evidence before me having any tendency to show any collusion or conspiracy between Lamar, Stewart, Reese & Reese, and the receiver, or between any of them, in connection with said letters.

In relation to the claim of C. H. Dozier, filed and allowed in this case, a brief summary of the evidence is: Said claim is in due form required by law, and sworn to, and was allowed, as admitted in the specification of objection directed against it. Its basis is five notes made by the bankrupt, two of which are payable to C. H. Dozier, respectively, for $2,000 and $3,030.66, due respectively one day after date and on demand; the dates of said notes being March 16, 1915, and May 1, 1915. The other three notes are payable to Marion Central Bank, dated March 15, 1915, April 1, 1915, and May 8, 1915, respectively, for $1,057.78, $1,057.78 and $1,052.44. Each of them are duly transferred and indorsed by the cashier of said bank to said C. H. Dozier; the date of said transfer being November 13, 1915. From the testimony of C. H. Dozier, testifying with the books before him, it appears from said books of account that the consideration of the $3,030.66 note was notes to the amount of $3,000 owing from the bankrupt to the People's Bank and the $30.66 being the interest thereon. This witness also proved the signature of the cashier to the transfers of the three notes from the Marion Central Bank.

Counsel for objecting creditors assume in their brief, on the sixth page thereof, that the witness Dozier testified that the amounts embraced in the three notes (transferred by Marion Central Bank to C. H. Dozier) is the same as the amount embraced in the note to C. H. Dozier for $3,030.66. I did not understand the witness to so testify, and as a matter of fact he explained that he did not so mean to testify. The three notes referred to were payable to Marion Central Bank, and according to the books, and testimony of said witness, C. H. Dozier, Jr., the consideration of the $3,030.66 was cash paid by C. H. Dozier to the People's Bank to take up $3,000 worth of notes of bankrupt due said bank, and that the $30.66 was interest thereon. The aggregate

amount of said three notes to Marion Central Bank is $3,168.10, while that of the note to Dozier is $3,030.66. This witness fully explains that he did not mean to so testify. Furthermore, one of said three notes is subsequent in date to the $3,030.66 note. As to the question of whether said latter note is dated "March 1, 1915," or "May 1, 1915," I cannot conceive of any reason, beneficial to Dozier, for such alteration; and if any alteration has been made it seems to me that it could have easily been explained by said cashier and the books of the bank. Witness further testified from the books that none of the notes attached to said proof of claim appear as credits on the personal account of C. H. Dozier with the bankrupt. There is no evidence before me tending to show any defense against said notes. A transcript of said C. H. Dozier account is attached to testimony of C. H. Dozier, Jr.

As to the payment of the capital stock, the evidence shows from the books of account, as explained by said witness C. H. Dozier, Jr., that the first $18,000 was paid on dates from December 24, 1912, to February 27, 1913, as follows: December 24, 1912. $1,500; January 1, 1913, $1,000; January 6, 1913, $6,000; December 27, 1912, $3,479; January 6, 1913, $120; January 23, 1913, $1,540; January 29, 1913, $1,500; February 24, 1913, $2,000; February 27, 1913, $861—making $18,000 in all. The item of $1,540 was charged to the individual or personal account of C. H. Dozier. The last $1,500 was cash, and the other payments were by check, and the books, as well as the passbooks of the People's Bank and the Marion Central Bank, show that said cash item and all of said checks were deposited in one or the other of said banks to the credit of the bankrupt firm; the items of deposit in said passbooks being identified in the stenographer's minutes by a red cross mark. On the individual account of C. H. Dozier with the bankrupt he is, on January 14, 1914, charged with treasury stock $12,000. On the date said charge was made against said Dozier on his account, said account showed a credit balance in favor of him of $13,193.63. It also showed a credit balance in his favor at time of bankruptcy of $765.56, exclusive of any of the items embraced in the claims of said Dozier filed in this bankruptcy.

No evidence was offered before me having any tendency to show nonpayment of any of the stock subscribed for, nor any showing that said Dozier owed the bankrupt anything, which was proper to set off against said claim of Dozier, or against the said payments on account of said stock.

In this case objecting creditors, without objection, offered in evidence all the books of bankrupt, and all the proceedings in the creditors' meeting; it being stated that I would consider same so far as I could remember same. The books are exceedingly numerous and bulky, and no particular portions of them have been called to my attention, except as shown by the stenographic minutes. Collier on Bankruptcy, p. 33, declares this practice is loose and should not be followed; that the better method, where a stipulation is possible, is to call out those portions that are pertinent and read them in. However, I am unable to say that the books show any such preferential payments as would be recoverable by the trustee; it not being even suggested by any evidence as to whom the payments were made, and there being no evidence before me, as to the knowledge or intent of such creditors, such as would make them recoverable, if any may have received such payments within said four months.

The purpose of specifications of objection is to give the bankrupt notice of particular conduct of his which is challenged (Collier, 322; In re Hirsch [D. C.] 2 Am. Bankr. Rep. 715, 96 Fed. 468), and they should contain allegations sufficient to show all essential facts existing bringing the opposition within the grounds specified by the statute (Collier, 324). They must be clear and unequivocal, and contain specific averments of facts. They should be pleaded with greater particularity than complaints in civil actions. Collier, 324. Specifications and proof in support must be clear, positive, and direct. The opposing creditor must distinctly allege and prove one or more of the statutory grounds. In re Griffin Bros. (D. C., Toulmin, Judge) 19 Am. Bankr. Rep. 78, 154 Fed. 537. See, also, In re McGurn (D. C.) 4 Am. Bankr. Rep. 459, 102 Fed. 743; In re Thomas (D. C.) 1 Am. Bankr. Rep. 515, 92 Fed. 912; In re Holman (D. C.) 1 Am. Bankr. Rep. 600, 92 Fed. 512; In re Hixon (D. C.)

1 Am. Bankr. Rep. 610, 93 Fed. 440; In re Kaiser (D. C.) 99 Fed. 689; In re Hirsch, supra; In re Peacock (D. C.) 4 Am. Bankr. Rep. 136, 101 Fed. 560; In re Quackenbush (D. C.) 4 Am. Bankr. Rep. 274, 102 Fed. 282; In re Gross, 5 Am. Bankr. Rep. 271; In re Wolfensohn, 5 Am. Bankr. Rep. 60; In re Wetmore (D. C.) 99 Fed. 703; In re Idzall (D. C.) 2 Am. Bankr. Rep. 741, 96 Fed. 314; In re Main (D. C.) 30 Am. Bankr. Rep. 547, 205 Fed. 421.

The allegations must be specific and of such a character that their sufficiency may be met by demurrer, or by exceptions analogous to those allowed in equity. Mere general averments are not sufficient. If they fail to allege any fact which by construction would be deemed ground for denial, they may be disregarded, though not excepted to. Collier, pp. 325, 326; In re Troeder, 17 Am. Bankr. Rep. 723, 150 Fed. 710, 80 C. C. A. 376; In re Steed (D. C.) 6 Am. Bankr. Rep. 73, 107 Fed. 682; In re Peck (D. C.) 9 Am. Bankr. Rep. 747, 120 Fed. 972; In re Parish (D. C.) 10 Am. Bankr. Rep. 548, 122 Fed. 553; In re Chandler, 14 Am. Bankr. Rep. 512, 138 Fed. 637, 71 C. C. A. 87. It is held in Re Mintzer (D. C.) 197 Fed. 647, 28 Am. Bankr. Rep. 743, that specifications in general terms following the language of the statute are insufficient. The grounds specified must be one of those enumerated in the statutes. In re Griffin Bros., supra. This case, decided by the judge of this district, is one of the clearest and most lucid discussions of the necessary allegations and proof required in specifications.

In my opinion, the first specification is insufficient. It does not allege any of the grounds enumerated in the statute, no evidence was offered in support of it, and, further, it is a fact that I mailed notice of the first meeting of creditors to all of the creditors scheduled, including the creditor mentioned in said specification. The envelope containing each of said notices had my official return address thereon, and has never been returned to me. I therefore find that said specification is not sustained by the evidence.

The second specification, so far as its meaning can be gathered by reading it, and the evidence offered relating thereto, is predicated on the fact that certain property—the warehouse—is scheduled as valueless, which is worth at least $3,000, and that the offer of composition is less than would be realized on sale of the assets of the bankrupt. The allegation that it "is scheduled as valueless," seemingly the conclusion of the pleader, is not borne out by the evidence, as the official schedule shows that this warehouse was listed with the explanatory note relating thereto, which note is set out heretofore in this report, and from which note it appears that the bankrupt was 'unable to estimate its value as an asset; and from said note I am unable to derive any suggestion even intimating that same was valueless. The explanation is plainly that bankrupt is unable—did not know how—to fix or estimate its value as an asset; and for reasons hereinafter set out I think such conclusion was fully justified.

No evidence was offered in support of the allegation that more would be realized to the creditors by a sale of the assets than is offered by the composition; on the contrary, Mr. Monk, president of the Central Alabama Dry Goods Company, shown to have large experience in bankrupt sales, testified that in his opinion the assets would not likely sell for over $5,000, and that is the conclusion I reach, and I do not think that more could be realized to creditors by sale than is offered by the composition, and this would still be my conclusion, even though it were shown that several hundred dollars could be realized by sale of the warehouse.

Section 70, subd. "a," of the Bankrupt Act (Act July 1, 1898, c. 541, 30 Stat. 565 [Comp. St. 1913, § 9654]), specifies and determines what property passes to the trustee and becomes assets in his hands. The only part of said subdivision "a" which could by a possibility relate to this warehouse is the following part of the clause numbered (5): "(5) Property which prior to the filing of the petition he could by any means have transferred, or which might have been levied upon and sold under judicial process against him. * * *"

Under the terms of the contract with the Southern Railway Company, referred to heretofore in this report, it is my opinion as a matter of law, and I so hold, that, except as to the privilege of removing the material from the railroad, the bankrupt had no property rights arising out of said contract,

which he could by any means have transferred or which might have been levied upon and sold under judicial process against him and I further hold that the only property right which could pass to the trustee as an asset was the right to remove and sell said material according to the terms of the contract. As to the value of such material one witness, Wood, testified that the material in the brick warehouse he thought would be worth $400, and that in the wood building $100; that the cost of tearing down the wood building would be about $25. He failed to testify as to what would be the cost of tearing down the brick warehouse, or restoring the ground to the condition required by the contract. The questions which elicited these answers as to the value of said materials were objected to, and such objections were sustained, because said witness was not shown to know the values inquired about. The witness Kemp, a very intelligent man of many years' experience in such matters, testified that the material salved from the taking down of the buildings would hardly be sufficient to pay expenses thereof and of putting the ground in its original condition according to the terms of said contract. There is therefore before me no evidence from which I can conclude, as a matter of fact, that this right to remove this material is of any value as an asset of the estate; but, if so, its value at least is problematical and uncertain.

The approval of a majority of the creditors is evidence, prima facie, that the composition is for the best interests of the creditors, and the burden is on those who attack it to show the contrary. Collier, p. 297; In re Waynesboro Co. (D. C.) 19 Am. Bankr. Rep. 487, 157 Fed. 101; In re Hoxie (D. C.) 25 Am. Bankr. Rep. 32, 180 Fed. 508; In re Barde & Levitt (D. C.) 31 Am. Bankr. Rep. 736, 207 Fed. 654; City Bank v. Doolittle, 5 Am. Bankr. Rep. 736, 107 Fed. 236, 46 C. C. A. 258. There must be a positive showing to rebut this presumption that the action of the majority is for the interest of all. Collier, p. 297; In re Weber Co., Fed. Cas. No. 17,330; Id., 17,331; In re Greenebaum, Fed. Cas. No. 5769.

My report of this composition shows its acceptance by 42 creditors, whose claims aggregate $13,115.79. The objecting creditors are Van Camp Products Company and Hancock Bros. & Co., whose claims amount, respectively, to $316.80 and $37.82. It is my conclusion, based on all the evidence, that the creditors would realize more under the composition than by a sale of the assets. Without passing on the pleadings, I find upon the evidence that the second specification is not sustained.

In my opinion, the third specification does not allege any of the grounds enumerated by the statutes; but I do not deem it necessary to pass on the exceptions to it. There is no evidence before me showing a concealment, nor an attempted concealment, nor any false statement sent out by the bankrupt, or any of the other persons mentioned therein. This specification, which is very vague, according to the evidence is based on the fact that the warehouse was an asset of great value, and Mr. Stewart in his letter failed to mention it as an asset, and that Reese & Reese failed to call it to the attention of their clients that it was a valuable asset. As already stated, in my opinion it is an asset of but small and problematic value. I find that this third specification is not sustained by the evidence.

The fourth is also based, so far as its meaning can be gathered, on the value of the warehouse, it avers it to be worth $5,000; that the bankrupt "colluded with the petitioning creditors, the attorneys representing a majority of the creditors and the receiver to "conceal and deceive creditors" as to the condition of bankrupt estate; that bankrupt sent out a statement to the creditors "in which it failed to list" the warehouse; and that attorneys representing a majority of the creditors wrote their clients that they had receiver's inventory, and that bankrupt's statement as to what it showed was correct. The evidence is without dispute that bankrupt sent out no statement, and that allegation probably refers to the letter written by Mr. W. A. Sewart, its attorney. The figures given in that letter, upon comparison, are identical with those shown by the said inventory filed in my office by said receiver. There is no evidence before me having any tendency to show any conspiracy to deceive any of the creditors. It is unnecessary for me to again state my

conclusion as to the value of the warehouse as assets. I find that the fourth specification is not sustained by the evidence.

No evidence was offered in support of the fifth specification, and I therefore find that it is not sustained by the evidence.

The sixth specification is to the effect that C. H. Dozier, who was president of the bankrupt, "did file a claim with the referee, * * * which was allowed, and which is not a bona fide (?) claim or charge against the estate of said bankrupt." Pretermitting any discussion as to the extent of the effect or limitation affected by the use of the words "bona fide," and without passing on the sufficiency of said specification, it will be observed that said specification admits that said claim has been allowed. The bankrupt's counsel strongly contended that the allowance of said claim was a judgment in favor of said C. H. Dozier; that it could not be attacked collaterally on this reference; that said judgment was in the nature of res adjudicata; that said claim could only be attacked on petition of the trustee to re-examine and disallow or reduce said claim (a trustee has been duly appointed and qualified in this cause)—citing in support of said proposition the case of In re Lewensohn, 9 Am. Bankr. Rep. 368, 121 Fed. 538, 57 C. C. A. 600. In my view of the evidence relating to this claim, a decision of the above question of evidence is unnecessary. As already stated in this report, said claim is properly proven according to the statute and in the form provided therefor. No evidence in rebuttal thereof, or from which a contrary inference is raised, has been presented. I therefore find that the evidence does not sustain the sixth specification.

I am of the opinion that the composition should be confirmed, and I do therefore recommend that it be confirmed. Considerable costs and expenses have been incurred in the execution of this reference, an itemized statement of which is handed up with this report, and which should be taxed against the objecting creditors.

Reese & Reese, of Selma, Ala., for petitioning creditors.

A. W. Stewart, of Marion, Ala., for bankrupt.

J. C. Foster, of Marion, Ala., and Brown & Ward, of Tuscaloosa, Ala., for objecting creditors.

HENRY D. CLAYTON, District Judge. This cause, coming on to be heard, is submitted for order and decree upon the motion of the bankrupt and certain of his creditors to dismiss or strike from the file the additional specifications of objection to the confirmation of the composition, and also for decree upon objections of certain creditors to the composition, and for decree in the matter of such composition reported and recommended by the special master in his report dated March 25, 1916.

The report and the testimony in the case have been carefully considered by me, and I have heard and considered the argument of the attorneys in opposition to the confirmation of the composition, as well as that of the attorneys in behalf of the confirmation. After careful examination and reflection, I have reached the conclusion that the real question to be decided in this case is whether or not the composition is for the best interest of the creditors of the estate. If this view be correct, and the whole controversy is reduced to that one question, it is unnecessary for me to pass upon several minor or incidental questions discussed during the oral argument. It is my opinion that the confirmation of the composition, as recommended by the special master, is to the best interest of all the creditors.

1. The letter of E. Lamar and that of A. W. Stewart to certain of

the creditors in connection with the composition were fully and satisfactorily explained, and are far from persuasive that they were instruments of deception or were even instrumental in deceiving or misleading the creditors who accepted the composition. Further, no injury was worked to any of the creditors by these letters.

2. The contention that the claim of C. H. Dozier, Sr., president of the bankrupt, should not have been allowed, perhaps, ought not now to be considered by the court. But, it having been considered, I find from all the evidence in the case that it was just and proper.

3. The alleged concealment of the "true condition of the bankrupt's financial condition" cannot here furnish a reason for disapproving the composition recommended. An examination of all the evidence in the case convinces me that there was no real, or at any rate no fraudulent, concealment of the assets of the bankrupt.

4 and 13. The objection that the subscription of C. H. Dozier, Sr., for $12,000 stock of the bankrupt corporation has not been paid is not well founded. The evidence satisfies me that such subscription has been paid.

5. The conditional leasehold interest in the warehouse, or conditional license to use the same, in accordance with the limitations of the contract between the bankrupt and the railroad company, was not such a part of the bankrupt's assets as that a failure to schedule the same can be held to be a concealment of assets. But, even if this be an asset at all, then it does not furnish any reason why the composition should not be allowed.

The liabilities of the bankrupt to unsecured creditors total $14,-945.09. The claims of creditors who have admitted preferential liens amount to $3,288.02. Omitting the contract lease or license of the warehouse property, the assets of the bankrupt were appraised at $6,-935.50. It is not to be doubted that this appraisement was fair, and that the reasonable value of the assets of the estate is not more than $5,000. So it is a matter of simple mathematics to show that, although the leasehold or license interest in the warehouse, if treated as a part of the available assets of the bankrupt and as worth $2,000, the maximum amount of value which the objecting creditors can fairly claim it has, this would not furnish any reason why the composition should not be approved as being in the best interest of all the creditors.

Treating the warehouse interest as an asset worth $2,000, and assuming that it could be sold for that amount, and that the other assets (as shown by the evidence) sell for more than $5,000, this would produce an aggregate amount of $7,000; from which, deducting the $3,288.02, amount of preferred claims, there would be left a balance of only $3,711.98. From this amount, of course, there must be further deductions for the costs of administration, including receiver's and trustee's fees and expenses, insurance, and fees of the various attorneys and officers. It is not necessary to hazard an estimate of the aggregate amount of these deductions, as it is already entirely obvious that the above amount of $3,711.98 is of itself insufficient to pay a dividend of 25 per cent. on $14,945.09, which dividend of 25 per cent. is what the creditors will receive under the composition.

However, assuming—as the court does—that the license in the warehouse property is not such property as passes to the trustee, the above figures would be reduced $2,000, and would be only $1,711.98, from which the costs of administration must be paid before being divided among the creditors; and it would be very doubtful even if as much as 5 per cent. could be realized to the general creditors.

6 and 10. It does not seem necessary to now consider the claim that large sums of money were paid out by the bankrupt to some of his creditors for debts due them within four months preceding bankruptcy. But, it being considered, I find that the evidence does not sustain these grounds of objection. The findings of fact and the conclusions of law applicable to the question raised by these objections are correctly stated by the special master in his report.

7. The seventh ground of objection to the report is not well taken. There was no collusion between the attorney representing the creditors and the attorney representing the bankrupt, whereby any fraud was perpetrated upon or done to the creditors of the bankrupt. The whole matter raised by this objection is fully and satisfactorily explained by the evidence.

And I find that the other objections, numbered 8, 9, 11, 12, 14, and 15, of a like tenor, are not well founded.

8. As to objection 16, it is no more than a general objection, predicated upon the second, third, fourth, fifth, and sixth specifications, which I have dealt with, and, in dealing with them as I have, necessarily the effect is to hold that objection 16 is without any worth.

9. As to objection 17, which is a general exception to that part of the report in which the special master finds that there was not sufficient evidence to support either of the objections to the said confirmation of said composition, it is sufficient to say that this is a general objection, which, if necessary to deal with at all, has been dealt with in my consideration of the several specific objections.

I am convinced that there is not sufficient merit in any of the 17 objections to the composition, or in all of them considered together, to warrant the court in disallowing the proposed composition.

Accordingly decree will be entered, approving the report of the special master and authorizing the composition recommended by him.